

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 12, 2020

<u>VIA ECF</u>

The Honorable J. Paul Oetken
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

Re:     **United States v. Vitali Voronjuk**
          18 Cr. 678 (JPO)

Dear Judge Oetken:

The defendant is scheduled to be sentenced on May 14, 2020 following his plea of guilty to import into the United States more than 400 grams of fentanyl and more than 100 grams of carfentanil, a fentanyl analogue, in violation of Title 21, United States Code, Section 963. The defendant's United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") sentence, as calculated by the Probation Department and as the parties stipulated in the plea agreement, is 135 to 168 months' imprisonment (the "Stipulated Guidelines Range"). The defendant worked with his drug trafficking associates in Estonia to import into the United States a massive quantity of carfentanil—a synthetic opioid that is used commercially to tranquilize large animals, and can be lethal to humans in the tiniest of doses—even though he knew full well that the drug he was manufacturing and distributing could kill those who used it. For the reasons that follow, the Government respectfully submits that a sentence within the Stipulated Guidelines Range would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

I.    **Background**

A.    The Offense Conduct

For at least a decade, the Drug Enforcement Administration ("DEA") Special Operations Division's Bilateral Investigations Unit ("BIU") has partnered with foreign law enforcement to curtail the massive flow of synthetic opioids from Asia, through Europe, and into the United States. As the opioid epidemic continues to wage a devastating toll in the United States and elsewhere—causing more than 130 overdose deaths a day in the United States—and as drug traffickers use increasingly sophisticated cyber tools and encrypted applications to conceal their

illicit activities, the DEA and other law enforcement agencies rely on investigative techniques such as sting operations to identify and infiltrate the supply and distribution chain, and disrupt those who would flood this country with deadly narcotics like fentanyl and its analogues.

In 2017, the BIU and Estonian law enforcement began investigating Amid Magerramov and Jevgeni Bokov for their involvement in Estonian organized crime, drug trafficking, and money laundering. As described below, the investigation revealed that Magerramov led a team of criminals, including the defendant, who produced carfentanil in Europe for distribution to the United States. Bokov, an experienced money launderer, agreed to illicitly wire the proceeds of narcotics sales through companies in Europe to banks in the United States.

In October 2017, a DEA confidential source (the "CS") met with Bokov and Magerramov over the course of two days in Tallinn, Estonia to discuss a potential narcotics trafficking and money laundering deal. (Probation Department Presentence Investigation Report ("PSR") ¶ 21). The CS told Bokov and Magerramov that he was a member of a Colombian drug cartel that trafficked drugs into the United States and needed assistance laundering the narcotics proceeds. (*Id.*) The parties exchanged contact information and agreed to meet again in the future to discuss a possible deal.[1]

Magerramov met with the CS again in Tallinn in January 2018. (*Id.* ¶¶ 36-38). During the meeting, the CS told Magerramov that his drug trafficking organization (the "DTO") was looking for a partner who could provide large quantities of fentanyl in Europe for transport to the United States. Magerramov confirmed that he knew "many people" who would be willing to provide the DTO with fentanyl, explained that fentanyl "is made for rhinoceroses," and confirmed that he "knew a lot about" fentanyl, and that when "[p]eople don't know the dose, [they] die." (*Id.* ¶ 36). As discussed below, one of the "many people" willing to provide these lethal drugs for importation to the United States was the defendant.

The following month, the CS met with Magerramov, co-defendant Nikolai Niftalijev, and the defendant in Poland to discuss the fentanyl trafficking partnership, and the meeting was recorded. (*Id.* ¶ 39). The CS explained that the DTO trafficked between 350 and 400 kilograms of heroin each month, and wanted to mix the heroin with fentanyl to make it "more powerful." (*Id.*). The CS said that one kilogram of heroin sold for $65,000 in New York, but that the price would double when the kilograms were cut with fentanyl. The defendant and Magerramov confirmed that the product they would provide was "very strong," and that a user could overdose from a quantity of fentanyl equivalent to one grain of salt. The defendant told the CS that the fentanyl they would provide was "very dangerous . . . . Very dangerous shit, this is big quality." (*Id.* ¶¶ 42-43). Voronjuk also explained that, because Estonian police had recently shut down fentanyl labs in Estonia, they would need to produce the drugs in a different country in Europe. (*Id.* ¶ 41).

---

[1] As detailed in the PSR, and after a series of meetings with the CS over the course of several months, Bokov subsequently laundered nearly $300,000 in what he believed were drug proceeds from Europe to banks in New York City. (PSR ¶¶ 22-35).

In March 2018, the defendant and Magerramov met with the CS again in Tallinn to discuss the defendants providing a sample of fentanyl so the DTO could "test" the quality. (*Id.* ¶ 45). The defendant explained, during the recorded meeting, that they would deliver batches of three different strengths: "strong. . . very strong and medium," and the defendant reiterated that the drugs were "very dangerous," even in "small, small, small" amounts. (*Id.* ¶¶ 44-46). Magerramov told the CS that each of the samples would contain approximately 100 grams of fentanyl, and Voronjuk said that the CS would need to provide an up-front payment of approximately 20,000 euros so they could begin producing the fentanyl for the samples. (*Id.*) The CS agreed to provide the payment in Estonia the following week, and the defendant and Magerramov told the CS that they would then deliver the samples to an associate of the CS in Denmark. (*Id.* ¶ 47).

Approximately one week later, the defendant and Magerramov met again with the CS over the course of two days. The CS provided the defendants with the 20,000 euro payment, and Voronjuk and Magerramov confirmed that they would deliver the drug samples to the CS's associate within three to four weeks in Denmark. (*Id.* ¶¶ 48-50). The CS explained that the samples would be delivered to the United States, and that once the DTO confirmed that it was satisfied with the quality, the DTO would purchase additional quantities of fentanyl from the defendants every approximately six weeks. (*Id.* ¶ 49). Voronjuk and Magerramov indicated that they understood and agreed—that they were prepared to provide fentanyl for distribution in the United States on a regular basis going forward.

Later in March 2018, the defendant, Magerramov, and co-defendant Viktor Litvintsuk met with the CS again to coordinate the delivery of the fentanyl samples. (*Id.* ¶ 51). The CS explained that his associate would park a car at a location in Copenhagen, Denmark, which location the CS would relay to Magerramov so the defendants could make the delivery. (*Id.* ¶ 52). The CS told the defendants that the DTO would mix the fentanyl with kilograms of heroin, which would expand each kilogram of heroin into three kilograms of heroin-fentanyl mixture.

On May 9, 2018, after Magerramov and the CS exchanged a series of text messages to coordinate the fentanyl delivery, the defendant, Magerramov, and Niftalijev delivered the samples to the CS's associate in Copenhagen. (*Id.* ¶¶ 55-59). The samples were packaged in three blue rubber gloves with five clear plastic bags containing carfentanil mixed with a substance that appeared to be brown sugar. (*Id.* ¶¶ 59-60). Consistent with the defendant's statements to the CS at the meeting discussed above, the bags were labeled with three different strengths of narcotic: one of the bags was labeled "I. Very Strong."; two of the bags were labeled "II.  We think it's Better For you."; and two of the bags were labeled with the number "III."

Magerramov continued to communicate with the CS by phone throughout May 2018 to confirm receipt of the samples and coordinate another drug transaction. (*Id.* ¶¶ 61-64). On May 30, 2018, the defendant and an associate delivered approximately 5.2 kilograms of carfentanil, cut with brown sugar, to the CS's associate's car in Copenhagen. (*Id.* ¶¶ 65-66).

A week later, in June 2018, the CS met with the defendant, Magerramov, and Litvintsuk in Tallinn.  (*Id.* ¶ 68).  The defendant and Magerramov told the CS that, while preparing the five-kilogram carfentanil mixture in Copenhagen, Niftalijev had fallen ill and was hospitalized. The CS confirmed that the DTO was satisfied with the quality of the samples the defendants had provided and wanted to purchase larger quantities of carfentanil from them.  (*Id.*)  The CS explained that he would be meeting with Bokov the next day to discuss setting up an account through which the CS could provide payments for additional shipments of carfentanil.  The defendant and Magerramov agreed that, once they received the payments, they would produce and transport more carfentanil to the DTO.  (*Id.* ¶ 69).  Voronjuk warned that the carfentanil was "very very strong," and that a person could "get addicted" after using it "just one time."  (*Id.*)

In July 2018, the CS provided Bokov with $20,000 and instructed Bokov to transfer the money to Magerramov as partial payment for the carfentanil.  (*Id.* ¶¶ 73-76).  Magerramov continued to communicate with the CS concerning payment for additional carfentanil shipments. (*Id.*).

### B.   The Arrest, Extradition, and Guilty Plea

The defendant was arrested, along with Bokov, Magerramov, and Niftalijev on September 4, 2018 in Estonia.[2]  (PSR ¶ 82).  He was extradited to this District on May 9, 2019 to face the charges in the Indictment.

The defendant pleaded guilty, pursuant to a plea agreement, to Count One of the Indictment on December 18, 2019.  (*Id.* ¶ 9).  The parties stipulated in the plea agreement to a Guidelines range of 135 to 168 months' imprisonment (*i.e.*, the Stipulated Guidelines Range).  (*Id.* ¶ 10).  The parties also agreed in the plea agreement that, based on the information then available to this Office, the defendant appeared to meet the criteria set forth in Section 5C1.2 of the Guidelines and Title 18, United States Code, Section 3553(f), and therefore was entitled to safety valve relief from the otherwise applicable mandatory minimum sentence of ten years' imprisonment.  The Probation Department similarly calculated the defendant's Guidelines range to be 135 to 168 months' imprisonment.  (PSR ¶ 137.)

The defendant requests a sentence of time served.  (Def. Mem. at 7).  The Probation Department recommends a sentence of 135 months in prison, explaining that the defendant "conspired to sell fentanyl, a potential deadly narcotic, which he knew would be transported within the borders of the United States. Voronjuk was well aware of the potential addictive nature of the fentanyl and the potential harmful effects of the drug based on his conversations with co-conspirators and his knowledge of his co-defendant being hospitalized while preparing the drugs." (*Id.* 29).  For the reasons that follow, the Government respectfully submits that a sentence within the Stipulated Guidelines Range of 135 to 168 months' imprisonment is appropriate in this case.

---

[2] Litvintsuk was arrested on September 5, 2018 and extradited to this District in February 2019.

## II.    Discussion

The general purposes of sentencing include the need for the sentence imposed to promote respect for the law, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.  *See United States* v. *Park*, 758 F.3d 193, 197 (2d Cir. 2014) (citing 18 U.S.C. § 3553(a)(2)).

A significant sentence is necessary to reflect the seriousness of the defendant's crimes, to afford just punishment, and to promote respect for the law.  The defendant and his co-conspirators produced nearly six kilograms of carfentanil that they believed would be imported into the United States.  They did so on the understanding that, if the CS's cartel approved of the quality of their drugs, they would partner with the cartel to traffic hundreds more kilograms into a country already ravaged by synthetic opioids.  And the defendant and his co-conspirators were well aware of the horrific, deadly consequences that could result from their crimes.

On average, nearly 130 people in the United States die of an opioid overdose every day.[3]  Between 2015 and 2017, the opioid epidemic caused the average life expectancy in the United States to decline for the first time since the AIDS epidemic in the 1990s.[4]  Although the overall drug overdose death rate has declined slightly in the last two years, the number of deaths caused by synthetic opioids such as fentanyl and fentanyl analogues continues to rise.  The New York Times recently reported that "[i]n 2018, more than 31,000 deaths involving synthetic opioids (other than methadone) occurred in the United States, which is more deaths than from any other type of opioid.  Synthetic opioid-involved death rates increased by 10% from 2017 to 2018 and accounted for 67% of opioid-involved deaths in 2018." *Id.*

Carfentanil, an analogue of fentanyl, is among the deadliest drugs in the world.  It is 100 times more potent than fentanyl and 1,000 times more powerful than heroin.[5]  Typically used to sedate large animals like elephants, just .02 milligrams, or "hardly more than a speck of dust" could cause someone to overdose and die.  Richard A. Friedman, *Ordering Five Million Deaths Online*, N.Y. TIMES, Apr. 4, 2018, *available at* https://www.nytimes.com/2018/04/04/opinion/carfentanil-fentanyl-opioid-crisis.html.    One kilogram of carfentanil contains approximately 50 million fatal doses.  Carfentanil is so potent that veterinarians wear face masks and gloves when they administer it to avoid exposure (*id.*), and the

---

[3] Centers for Disease Control and Prevention, America's Drug Overdose Epidemic: Data to Action, *available at* https://www.cdc.gov/injury/features/prescription-drug-overdose/index.html.

[4] Sabrina Tavernise and Abby Goodnough, *American Life Expectancy Rises for First Time in Four Years*, N.Y. TIMES, Jan. 30, 2020, *available at* https://www.nytimes.com/2020/01/30/us/us-life-expectancy.html.

[5] United States Department of Justice, Drug Enforcement Administration, Officer Safety Alert, *available at* https://www.justice.gov/usao-edky/file/898991/download.    Indeed, the DEA generally does not allow field testing of drugs suspected to contain fentanyl or fentanyl analogues because of the risks it could pose to agents in the field.

DEA has instituted emergency protocols for agents who may have been exposed to it when making arrests and seizures.[6]

As is chillingly reflected in his own words, the defendant understood that the drugs he trafficked would feed addictions and contribute to the misery opioids inflict on addicts and their families in this country.  For example, during recorded meetings with the CS, the defendant and Magerramov noted that the drug they were providing was "made for rhinoceroses," that a person could overdose from a quantity equivalent to a grain of salt, and that when "[p]eople don't know the dose, [they] die."  (PSR ¶¶ 36, 42-43).  They explicitly acknowledged that the drug's addictive qualities could cause a person to "get addicted" after using it "just one time."  (*Id.* ¶ 69; *see also id.* ¶ 43 (defendant stated: "You must know this is quality this is very dangerous. . . . Very dangerous shit, this is big quality.").  Indeed, the defendant pressed forward with distributing these deadly narcotics even though co-defendant Nikolai Niftalijev apparently had become ill while preparing the 5.2 kilograms of carfentanil in Denmark and had to be hospitalized.  (*Id.* ¶ 68).

Notwithstanding his awareness of the potentially devastating consequences of his actions, Voronjuk leapt at the opportunity to become involved in Magerramov's criminal venture, and remained steadfast in his commitment to seeing it through, meeting with the CS on multiple occasions in different countries, providing samples of his product for the cartel to test, delivering more than five kilograms of it for transport to the United States, and agreeing to set up a laboratory in Denmark to produce an infinite supply of his "very dangerous" drugs.  (PSR ¶¶ 43, 46, 73).  A substantial sentence is necessary to reflect the seriousness of the defendant's criminal conduct.

In advocating for a sentence that is nearly 90% lower than the bottom of the Stipulated Guidelines Range, the defendant asks the Court to consider his difficult childhood in the Soviet Union and the economic hardships he has faced; his contributions to his family and the toll his incarceration has taken on his wife and children; and the fact that he was arrested as a result of a law enforcement sting.  Although the Government has no reason to doubt the difficulties the defendant and his family have faced, none of these considerations merit a variance from the Guidelines range to which the parties stipulated.  Notably, the Probation Department does not recommend a downward variance from the Stipulated Guidelines Range.

*First*, the fact that the defendant was arrested as the result of a DEA sting does not change or mitigate the fact that the defendant voluntarily became involved in the drug trafficking operation and continued over the course of nearly a year to see it through.  The defendant does not claim (nor could he) that he was entrapped by law enforcement—as set forth above, he made clear throughout the DEA's investigation that he was ready, willing, and able to produce and provide as much carfentanil as the cartel requested.  Moreover, the defendant is mistaken that the

---

[6] Centers for Disease Control and Prevention, National Institute on Drug Abuse, Overdose Death Rates, *available at* https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates.

DEA began its investigation "with the purpose of inducing the defendant" (Def. Mem. at 6).  The DEA learned of the defendant only after he chose to join Magerramov's drug crew and began attending meetings with the CS, boasting of his familiarity with fentanyl and assuring the CS: "I give you good product . . . tell me what you need, I give you what you need . . . . This is very strong."  (PSR ¶ 42).  The defendant's eagerness to become involved in the criminal venture, his ability to produce and deliver large quantities of carfentanil in a short period of time, and his willingness to continue providing the drug even after supplying the 5.2 kilogram shipment eviscerate his claim that, but for the DEA's inducement, he was a law-abiding citizen who "never would have committed crimes."  (Def. Mem. at 6).  As reflected in the PSR, the recordings and other evidence in this case are devastating.  There is no mystery as to what transpired.  The defendant worked with his associates to produce bulk quantities of carfentanil for importation into the United States, knowing full well that the drugs were lethal even in microscopic amounts.  The defendant clearly did not care about the potential consequences of his actions.  He wanted to make money through distributing the drugs, even if doing so resulted in death.  His conduct warrants a substantial sentence of incarceration.

*Second*, the Court should view with skepticism the defendant's request for leniency based on the assertion that his arrest has caused his family to "re-live experiences of the times immediately followed collapse of the Soviet Union."  (Def. Mem. at 4).  The Government does not question that the defendant's crimes—and the incarceration that resulted from them—have had a devastating impact on his children's lives.  They are innocent, tragic victims of his poor decisions.  But the defendant apparently did not consider how his children would be affected when he chose to join Magerramov's criminal operation, when he traveled throughout Europe to secure and produce highly lethal drugs, and when he continued to meet with the CS to ensure the CS that he could provide more carfentanil at the cartel's request.  Nor do the unfortunate circumstances of the defendant's childhood justify the choices he made.  The Government does not question that the defendant has faced difficult challenges in his life.  But the overwhelming majority of those who grew up in Eastern Europe in the post-Soviet era do not choose to traffic drugs, commit crimes, and endanger countless people thousands of miles away.  It was the *defendant's* actions that "dealt a severe blow" to his family (*id.*) and his choices that resulted in his incarceration.  Those actions and choices call for a substantial term of imprisonment.

Accordingly, the Government respectfully submits that a sentence within the Stipulated Guidelines Range would be sufficient, but not greater than necessary, to achieve the objectives of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:   /s/ Shawn G. Crowley / George D. Turner
      Shawn G. Crowley / George D. Turner
      Assistant United States Attorneys
      (212) 637-1034 / 2562

cc:  Farrukh Nuridinov, Esq.